WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Louis Wikler, et al., | No. CV-17-02664-PHX-GMS |
| Plaintiffs, | **ORDER** |
| v. | |
| Privilege Underwriters Incorporated, et al., | |
| Defendants. | |

Pending before the Court are the Motion for Summary Judgment of Defendant Privilege Underwriters, Inc. (Doc. 163) and the Motion for Partial Summary Judgment of Plaintiffs Louis and Randi Wikler (Doc. 161). For the reasons set forth below, both motions are denied.[1]

## BACKGROUND

The Court "evaluate[s] each motion [for summary judgment] independently, giving the nonmoving party in each instance the benefit of all reasonable inferences." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2015) (citation and internal quotation marks omitted).

///

///

---

[1] The parties have requested oral argument. The request is denied. The parties have thoroughly discussed the law and the evidence, and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

## I. The Wiklers' Injuries

The Wiklers were involved in an automobile accident on April 14, 2014. Louis Wikler was diagnosed with a contusion of the chest wall as a result of the accident. Randi Wikler was more seriously injured than her husband—she fractured part of her left foot, and the injury aggravated an underlying congenital condition. After a few months in a protective boot, the fractures healed, and Ms. Wikler was able to take short hikes with the aid of hiking poles. Soon thereafter, however, she experienced pain in her ankle and was diagnosed with torn ligaments. On the recommendation of her doctor, Ms. Wikler underwent surgery in June 2016. However, that surgery was also not entirely successful, and Ms. Wikler's doctors have recommended another future operation.

## II. The Wiklers' Claim

The other driver was at fault in the accident but was insured only with state minimum liability limits of $15,000/$30,000. The Wiklers accepted the policy limits offered by the other driver's insurance a few months after the accident. At the time of the accident, the Wiklers' insurance policy with Defendants Privilege Underwriters Reciprocal Exchange and Privilege Underwriters, Inc. ("PURE") provided underinsured motorist coverage ("UIM"). The UIM provision of the contract states:

> We will pay compensatory damages which an "insured" is legally entitled to recover from the owner or operator of an "underinsured motor vehicle" because of "bodily injury":
> 1. Sustained by an "insured"; and
> 2. Caused by an accident.

(Doc. 162 at 53).[2]

The Wiklers informed PURE that they would be claiming the balance of their expenses pursuant to the UIM provision. PURE assigned Sandra Manzella to handle the claim.

In January 2015, Ms. Manzella asked the Wiklers if she could provide medical authorization forms to them to sign so that Ms. Manzella could begin gathering medical records. The Wiklers declined, citing implications with possible medical liens against

---

[2] "Arizona allows unlimited recovery for actual damages, expenses for past and prospective medical care, past and prospective pain and suffering, lost earnings, and diminished earning capacity." *Wendelken v. Superior Court In & For Pima Cty.*, 137 Ariz. 455, 458, 671 P.2d 896, 899 (1983).

- 2 -

them. In July 2015, Ms. Manzella sent medical authorization forms to the Wiklers so she could begin gathering the medical records. By October, the Wiklers had not signed the medical authorizations, but did send a demand letter to Ms. Manzella along with partial medical records. The following January, the Wiklers sent more medical records to Ms. Manzella.

In response to the demand letter, Ms. Manzella made a settlement offer: $8,000 for Louis, and $40,000 for Randi. The Wiklers informed Ms. Manzella that Randi had been forced to miss work from April 2015 to August 2015; Ms. Manzella responded that the records provided so far did not indicate that Randi had missed five months of work, and that without documentation of the missed work she could not simply take the Wiklers' word for it.

In February 2016, Ms. Manzella made a global settlement offer of $60,000 based on the records available to her. She also indicated that she would be willing to review any additional documentation that the Wiklers provided. The Wiklers made a counteroffer of $100,000. Ms. Manzella countered that offer with an offer of $70,000. The Wiklers then informed Ms. Manzella that Randi had been advised that she needed surgery on her ankle, and Ms. Manzella stated that she would need to re-evaluate the claim based on that information. Following the surgery, the Wiklers notified Ms. Manzella that Randi had lost her job because of her injuries. Ms. Manzella informed the Wiklers that she needed documentation to evaluate the claim and sent medical and employment authorizations to the Wiklers.

Several months later, in February 2017, the Wiklers provided the signed authorizations. Ms. Manzella then requested and received medical records from various medical providers and employers. In March 2017, the Wiklers sent another demand letter to Ms. Manzella in the amount of $1,432,450.50. Ms. Manzella again responded that she would review the demand once she had obtained the necessary records. After the Wiklers provided more medical records, Ms. Manzella informed the Wiklers she would be completing her evaluation based on the records in her possession as of April 5, 2017.

The Wiklers' claim file around that date contains the following notes:

> SETTLEMENT RANGE:
> -**2 fractures in ankle with no surgery, up to 2 years of treatment, see up to $50K**
> In Cast & wheelchair for 3 months, $5K per month = $15K
> In Air boot for 2 months, $3K per month = $6K
> Back in Air boot for 2 months, $3K per month = $6K
> -**Surgery to left ankle to repair underlying congenital problem aggravated by MVA diagnosed 10 months post MVA, $25K**
> -**Factor in loss of enjoyment on cruises, cost for both is just under $17K**
> -**Loss of work & wages, but is on disability. Would work likely to age 65. 11 years** @ $32,780.80 = $360,588.08**.**
>
> FULL VALUE $92K, less underlying of $15K, see up to $77K to resolve
>
> In AZ, must include the meds which total $399K w/o surgery, but there is no lien at this time
>
> See settlement value up to $100K.

(Doc. 162 at 69) (no alterations made). Ms. Manzella's final offer to the Wiklers, based on the records in her possession at the time, was $77,500. The offer required the Wiklers to sign a form releasing PURE from of any further liability. The Wiklers then filed this suit in Superior Court for Maricopa County. PURE removed the action to this court in August 2017.

## DISCUSSION

### I. Legal Standards

A principal purpose of summary judgment is to identify factually unsupported claims and dispose of them. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Parties opposing summary judgment are then required to "cit[e] to particular parts of materials in the record" that either establish a genuine dispute or "show[] that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. Pro. 56(c)(1). If the non-moving party's opposition fails to do so, the court is not required to comb through the record on its own to come up with reasons to deny a motion for summary judgment. *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (citing *Forsberg v. Pacific N.W. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)).

**II. Analysis**

 **A. Wikler's Motion for Partial Summary Judgment**

The evidence in this case discloses disputes of material fact regarding the Wiklers' bad faith claim and the issue of medical costs. Summary judgment in their favor is therefore denied.

  **1. Bad Faith**

"[T]here is a legal duty implied in an insurance contract that the insurance company must act in good faith in dealing with its insured on a claim, and a violation of that duty of good faith is a tort." *Noble v. Nat. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981). The tort of bad faith recognizes that "implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured." *Rawlings v. Apodaca*, 151 Ariz. 149, 154, 726 P.2d 565, 570 (1986).

To establish bad faith on the part of the insurer, a plaintiff must show that the insurer intentionally denied a claim, failed to process a claim, or failed to pay a claim without a reasonable basis for doing so, *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 237, 995 P.2d 276, 279 (2000), and that the insurer did so with knowledge or reckless disregard of the unreasonableness of its actions. *Deese v. State Farm Mut. Auto. Ins. Co.*, 172 Ariz. 504, 506, 838 P.2d 1265, 1267–68 (1992) (internal quotation marks omitted). The first

inquiry involves an objective analysis that focuses on whether the insurer acted unreasonably, while the second involves a subjective analysis as to "whether the insurer knew that its conduct was unreasonable or acted with such reckless disregard that such knowledge could be imputed to it." *Id.* at 507.

Thus, to prevail on summary judgment on their bad faith claim, the Wiklers must show that there is no genuine dispute of material fact that PURE (1) acted unreasonably in its handling of their claim and (2) knew or acted with reckless disregard of the fact that its conduct was unreasonable. *Deese*, 172 Ariz. at 506.

The Wiklers contend that PURE unreasonably excluded medical expenses and lost wages from its calculation of Ms. Wikler's claim. Ms. Manzella's notes in the claim file indicate that Ms. Wikler's medical expenses totaled $399,000 and that her past and future lost wages totaled $360,588. (Doc. 162 at 69). This is in addition to Ms. Manzella's apparent calculation that Ms. Wikler was entitled to $92,000 in compensatory damages. (*Id.*). Ms. Manzella's final offer to the Wiklers totaled only $77,500. (*Id.* at 70). In the Wiklers' view, these notes show that Ms. Manzella knowingly excluded Ms. Wikler's medical and lost wage expenses from PURE's final offer. Since the contract obligated PURE to pay the compensatory damages the Wiklers would have been entitled to under Arizona law, the Wiklers argue that PURE's final offer intentionally violated the UIM provision and was therefore made in bad faith.

PURE counters with Ms. Manzella's affidavit, in which she states that she incorrectly wrote that Ms. Wikler's medical expenses totaled $399,000, and that she also erroneously listed amounts paid by Blue Cross/Blue Shield and amounts billed by Prime Therapeutics—neither of which related at all to the Wiklers' claim. (Doc. 197-19 at 1). Adding to the confusion, the Wiklers themselves concede that the $399,000 sum is too high—they note that past medical expenses totaled only $132,816 and future medical expenses are estimated at approximately $99,000, resulting in an estimated total of $231,816. (Doc. 188 at 6 n.1).

///

"Due to the passage of time," Ms. Manzella cannot account for the presence of the incorrect medical expense amounts, but she asserts that those totals were erroneous because of the documentation that she had in her possession at the time she wrote the notes. (Doc. 197-19 at 1). In April 2017, Ms. Manzella states that she had documentation for medical bills totaling only $32,996. (*Id.* at 2). She also had documentation for the number of hours Ms. Wikler missed at work, which—assuming all of Ms. Wikler's missed work hours resulted from her injury[3]—resulted in missed wages of $7,375. Ms. Manzella's affidavit states that the amounts in the claims file represent "rough mathematical calculations" for a scenario in which Ms. Wikler was unable to work until retirement age. (*Id.*). A jury could conclude, based on Ms. Manzella's statements, that PURE's final offer of $77,500 could have in fact included medical expenses, lost wages, and other damages to which the Wiklers would have been entitled under Arizona law.[4]

As the evidence shows, there are multiple possible totals for the Wiklers' medical expenses. This constitutes a genuine dispute of material fact. A reasonable jury could conclude, based on the evidence, that PURE's offer in fact included medical expenses and lost wages, and therefore PURE's final offer was not unreasonable. Based on the same evidence, a jury could reasonably conclude that PURE did not know or act in reckless disregard of the fact that its actions in handling the Wiklers' claim were unreasonable. The Wiklers are therefore not entitled to summary judgment. *See Anderson*, 477 U.S. at 248.

### 2. Medical Costs

The Wiklers are likewise not entitled to summary judgment on the issue of medical costs. The Wiklers seek an order from the Court stating that costs from the Mayo Clinic and HonorHealth Greenbaum Surgery Center represent the reasonable expenses of the medical care described in the records, and that the projection of costs for the recommended

---

[3] PURE points out that, during the time in which Randi missed 234 hours or work, she also went on multiple vacations. (Doc. 197-19 at 2).

[4] The Court declines to strike Ms. Manzella's affidavit in its entirety. However, in ¶ 15 of the affidavit, Ms. Manzella makes the conclusory statement that "[t]he amount of the offer is reasonable." (Doc. 197-19 at 3). This statement is conclusory and will not be considered for purposes of this order.

future surgery represents a reasonable expense of the facility fee. (Doc. 161 at 10). The PURE UIM policy obligated it to pay "compensatory damages which an 'insured' is legally entitled to recover from the owner or operator of an 'underinsured motor vehicle.'" (Doc. 162 at 53).

To recover past medical expenses, a plaintiff must show that the expenses were reasonable and necessary. *Larsen v. Decker*, 196 Ariz. 239, 243–44, 995 P.2d 281, 285–86 (Ariz. Ct. App. 2000); *Jacobs v. Am. Family Mut. Ins. Co.*, No. CV-13-01404-PHX-SRB, 2015 WL 12977506, at *4 (D. Ariz. Jan. 15, 2015) (citing *Larsen*). The Wiklers, relying on *Banner Health v. Medical Savings Ins. Co.*, 216 Ariz. 146, 152–53, 163 P.3d 1096, 1102–03 (Ariz. Ct. App. 2007), request that this court issue an order stating that the medical charges of $37,578.35 from the Mayo Clinic and $45,461.43 from the HonorHealth Greenbaum Surgery Center are reasonable expenses for past medical services received by Randi and that the reasonable expense for her future surgery is $88,000. However, *Banner Health* did not hold that, as a matter of law, the rates filed with the relevant Arizona regulatory authorities are reasonable *per se* in the context of calculating past medical expenses tort damages.

PURE's medical-expense auditor, Nancy Fraser Michalski, concluded that the charges billed by the Mayo Clinic and Scottsdale Healthcare for services rendered to Ms. Wikler are unreasonable. Ms. Fraser Michalski states that the Mayo Clinic over-charged Ms. Wikler by $14,000, and that Scottsdale Healthcare over-charged her by $35,000. Fraser Michalski also states that the estimate for Ms. Wikler's future operation is too high by several thousand dollars.

The Wiklers have not demonstrated that an absence of genuine dispute exists regarding whether the medical bills submitted are reasonable and necessary, and therefore a jury question exists regarding that issue. The Wiklers are therefore not entitled to summary judgment on the question.

/ / /

/ / /

**B. PURE's Motion for Summary Judgment**

**1. Bad Faith**

For the reasons discussed previously in Part II(A)(1) of the Court's analysis, and for the following reasons, PURE is not entitled to summary judgment on the Wiklers' bad faith claim.

PURE's argument focuses primarily on its claims-handling process and asserts that the evidence establishes that Ms. Manzella handled the claim reasonably. Ms. Manzella was in frequent contact with the Wiklers during the claims process and asked them on multiple occasions to sign medical and employment authorizations so she could collect the necessary records. (*See*, *e.g.*, Doc. 164-4 at 33–34). The Wiklers, however, declined to sign medical authorizations for an extended period of time, and PURE did not receive signed authorizations until February 2017, approximately nineteen months after Ms. Manzella provided the forms. (*Id.* at 18). Without the forms, PURE's ability to investigate the claim was limited—they were only able to obtain records the Wiklers chose to provide. Thus, PURE's settlement offers during that time—which PURE points out were made in response to demand letters from the Wiklers—were limited to the amounts established by the documentation provided by the Wiklers. In PURE's view, this evidence establishes that its handling of the claim was objectively reasonable under the circumstances.

Ms. Manzella's notes in the claim file from April 2017 (discussed previously), however, could show that Ms. Manzella was aware throughout this period that the Wiklers were entitled to substantially more money than PURE acknowledged. (Doc. Doc. 197-19 at 1). Further, notes from the claim file in June 2016 could demonstrate that PURE decided to take $10,000 from Louis' claim and move it to his wife's claim. (Doc. 189-13 at 1). The Wiklers view that decision as clear evidence of arbitrary decision-making in the handling of their claim and as evidence of PURE's unreasonable actions.

There is also evidence that PURE claims adjusters were pressured to close claims as soon as possible, whether they were handled properly or not. In her deposition, Ms. Manzella acknowledged that her ability to close claims quickly was part of her evaluation

for "merit raises." (Doc. 189-2 at 8). She also stated that her supervisor had previously announced the "closing results" for each of the adjusters during their group meetings. (*Id.* at 11–12). She also testified that on occasion, her supervisor would send emails encouraging the closing of claims. (*Id.*). Although her testimony was that the supervisor did not do so often—in fact that it had been "some time" since he had announced individual numbers in meetings—a jury could reasonably conclude that adjusters at PURE were pressured to close claims as soon as possible, regardless of how the claims were handled.

Disputes of material fact remain regarding the Wiklers' bad faith claim. A reasonable juror could return a verdict in the Wiklers' favor based on the evidence. For that reason, summary judgment is inappropriate. *See Anderson*, 477 U.S. at 248.

### 2. Punitive Damages

PURE is not entitled to summary judgment on the issue of punitive damages. Punitive damages require "something more" than simply demonstrating that a tort occurred. *See Rawlings v. Apodaca*, 151 Ariz. 149, 162, 726 P.2d 565, 478 (1986). "The requisite 'something more,' or 'evil mind,' is established by [clear and convincing] evidence that [the] defendant either (1) intended to injure plaintiff or (2) consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Gurule v. Illinois Mut. Life and Cas. Co.*, 152 Ariz. 600, 602, 734 P.2d 85, 87 (1987) (citations and internal quotation marks omitted).

A jury could find, based on the evidence previously discussed, that PURE consciously mishandled the Wiklers' claim knowing that by doing so it created a substantial risk of harming them. If a jury were to credit the evidence that PURE was arbitrarily changing the claims amounts it was considering for Louis Wikler, closing claims as soon as possible regardless of whether they were handled properly, or intentionally failing to follow its own internal policies for claims handling, that jury could reasonably conclude that PURE's conduct rose to the level for which punitive damages would be available. For that reason, summary judgment on the issue of punitive damages is not appropriate.

**IT IS THEREFORE ORDERED** that the Motion for Partial Summary Judgment of Louis and Randi Wikler (Doc. 161) is **DENIED**.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment of Defendant Privilege Underwriters Reciprocal Exchange, Inc. (Doc. 163) is **DENIED**.

Dated this 21st day of March, 2019.

*G. Murray Snow*
G. Murray Snow
Chief United States District Judge